**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

GRANT F. SMITH,

        Plaintiff,

  v.

CENTRAL INTELLIGENCE AGENCY,

        Defendant.

Case No.:  1:15-cv-01431 (TSC)

Electronically Filed

**MEMORANDUM IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

The plaintiff in this Freedom of Information Act ("FOIA") case, Grant F. Smith, requested that the defendant, the Central Intelligence Agency ("CIA" or "the Agency"), provide him with a copy of intelligence budget line items supporting Israel.  The CIA, following five decades of D.C. Circuit precedent, properly issued a *Glomar* response to Plaintiff's request, *i.e.*, it refused to confirm or deny the existence of such records, because the existence (or non-existence) of such records was a fact that Congress protected from release by FOIA Exemptions 1 and 3 .

This response was in keeping with well-established case law from this Circuit holding that specific information about intelligence budgets is protected from disclosure under FOIA. That is so under two FOIA Exemptions.  First, the existence or non-existence of intelligence budget line items is properly classified, and therefore protected by FOIA Exemption 1. Intelligence budget entries reflect important information on intelligence sources, methods, and priorities.  Moreover, revealing information about intelligence expenditures could reasonably be expected to damage relationships between the U.S. Government and foreign governments, harming the CIA's ability to work collaboratively with those countries – and hindering the national security of the United States.  Both of these reasons independently justify classification. Second, the National Security Act of 1947 requires that information relating to intelligence sources and methods be protected from disclosure by FOIA Exemption 3.  That information, as courts in the D.C. Circuit have repeatedly held, includes intelligence expenditures.

Nor can Plaintiff meet his burden of establishing that any exception to the *Glomar* doctrine exists.  Contrary to his implicit claim in his Complaint, the specific information he seeks has never been officially acknowledged by government officials.   Accordingly, the CIA's

response to Plaintiff's FOIA request was entirely proper, and Defendant respectfully asks this Court to enter summary judgment in its favor.

## FACTUAL BACKGROUND

By letter dated March 19, 2015, Plaintiff requested "a copy of the intelligence budget that pertains to line items supporting Israel [from 1990 through 2015]." Compl., Ex. 1, ECF No. 1. On April 15, 2015, the CIA denied Plaintiff's request, stating:

> In accordance with section 3.6(a) of Executive Order 13526, the CIA can neither confirm nor deny the existence of records responsive to your request. The fact of the existence or nonexistence of requested records is currently and properly classified and is intelligence sources and methods information that is protected from disclosure by section 6 of the CIA Act of 1949, as amended, and section 102A(i)(1) of the National Security Act of 1947, as amended. Therefore, your request is denied pursuant to FOIA exemptions (b)(1) and (b)(3).

*Id.*, Ex. 2, Plaintiff filed an administrative appeal on May 5, 2015, *id.*, Ex. 3, which the CIA docketed on May 15, 2015, *id.*, Ex. 4. On September 2, 2015, before the administrative appeal process was completed, Plaintiff filed this lawsuit. *See* Compl.

## STATUTORY STANDARDS

### A.  The Freedom of Information Act and *Glomar* Responses.

FOIA's "basic purpose" reflects a "general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (citation and internal quotation marks omitted). "Congress recognized, however, that public disclosure is not always in the public interest." *CIA v. Sims*, 471 U.S. 159, 166–67 (1985). Accordingly, "FOIA represents a balance struck by Congress between the public's right to know and the government's legitimate interest in keeping certain information confidential." *Ctr. for Nat'l Sec. Studies v. Dep't of Justice*, 331 F.3d 918, 925 (D.C. Cir. 2003) (citing *John Doe Agency*, 493 U.S. at 152).

As a manifestation of that balance, FOIA mandates disclosure of agency records unless the requested information falls within one of nine enumerated exemptions.  *See* 5 U.S.C. § 552(b).  Two such exemptions are relevant to this case.  Exemption 1 exempts from disclosure materials properly classified as "secret in the interest of national defense or foreign policy," *id.* § 552(b)(1), and Exemption 3 shields from release materials that are "specially exempted from disclosure by statute," *id.* § 552(b)(3).

Normally, "agencies must acknowledge the existence of information responsive to a FOIA request and provide specific, non-conclusory justifications for withholding that information."  *Roth v. Dep't of Justice*, 642 F.3d 1161, 1178 (D.C. Cir. 2011).  But that general rule admits a key exception, *see id.*, which applies in this case.  It is well-established that "the CIA 'may refuse to confirm or deny the existence of records where to answer . . . would cause harm cognizable under an FOIA exception.'" *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007) (quoting *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982)).  "Such an agency response is known as a *Glomar* response and is proper if the fact of the existence or nonexistence of agency records falls within a FOIA exemption."[1]  *Id.*  "The agency must demonstrate that acknowledging the mere existence of responsive records would disclose exempt information." *Elec. Privacy Info. Cntr. v. NSA*, 678 F.3d 926, 931 (D.C. Cir. 2012).  In doing so, the agency's explanatory burden is not demanding.  "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible."  *Id.* (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)).  That said, the *Glomar* doctrine is not without limits, and a "plaintiff can overcome a *Glomar* response by showing that the agency has already

---

[1] The term "Glomar" came from the case *Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976), where the CIA upheld the CIA's use of the "neither confirm nor deny" response to a FOIA request for records concerning the CIA's reported contacts with the media regarding a ship called the "Hughes Glomar Explorer."

disclosed the fact of the existence (or nonexistence) of responsive records, since that is the purportedly exempt information that a *Glomar* response is designed to protect." *Am. Civil Liberties Union v. CIA* ("*ACLU*"), 710 F.3d 422, 427 (D.C. Cir. 2013).  A plaintiff bringing a so-called "official acknowledgement" challenge "must bear the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld." *Id.* (quoting *Wolf*, 473 F.3d at 378).

"In reviewing an agency's *Glomar* response, th[e] Court exercises caution when the information requested 'implicates national security, a uniquely executive purview.'" *Elec. Privacy Info. Ctr.*, 678 F.3d at 931 (quoting *Ctr. for Nat'l Sec. Studies v. Dep't of Justice*, 331 F.3d 918, 926-27 (D.C. Cir. 2003) (bracket omitted)).  While courts review de novo an agency's withholding of information pursuant to a FOIA request, "de novo review in FOIA cases is not everywhere alike." *Ass'n of Retired R.R. Workers, Inc. v. U.S. R.R. Ret. Bd.*, 830 F.2d 331, 336 (D.C. Cir. 1987).  Although de novo review calls for "an objective, independent judicial determination," courts nonetheless must defer to an agency's determination in the national security context, acknowledging that "the executive ha[s] unique insights into what adverse [e]ffects might occur as a result of public disclosure of a particular classified record." *Ray v. Turner*, 587 F.2d 1187, 1194 (D.C. Cir. 1978) (internal quotation marks omitted).

Accordingly, courts have "consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review." *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 927; *see also Larson*, 565 F.3d at 865 ("Today we reaffirm our deferential posture in FOIA cases regarding the 'uniquely executive purview' of national security.").  "[I]n the national security context," therefore, "the reviewing court must give 'substantial weight'" to agency declarations. *Am. Civil Liberties Union v. Dep't of Justice*, 265

F. Supp. 2d 20, 27 (D.D.C. 2003) (quoting *King*, 830 F.2d at 217); *see Frugone v. CIA*, 169 F.3d 772, 775 (D.C. Cir. 1999) (stating that because "courts have little expertise in either international diplomacy or counterintelligence operations, we are in no position to dismiss the CIA's facially reasonable concerns" about the harm that disclosure could cause to national security); *Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990) (holding that the district court erred in "perform[ing] its own calculus as to whether or not harm to the national security or to intelligence sources and methods would result from disclosure").  In according such deference, "a reviewing court must take into account . . . that any affidavit or other agency statement of threatened harm to national security will always be speculative to some extent, in the sense that it describes a potential future harm."  *Wolf*, 473 F.3d at 374 (citation and internal quotation marks omitted).

**B.  Summary Judgment in *Glomar* Cases.**

"FOIA cases typically and appropriately are decided on motions for summary judgment." *Leopold v. CIA*, 106 F. Supp. 3d 51, 55 (D.D.C. 2015).  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"In *Glomar* cases, courts may grant summary judgment on the basis of agency affidavits that contain 'reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'"  *Elec. Privacy Info. Ctr.*, 678 F.3d at 931 (quoting *Gardels*, 689 F.2d at 1105).  If a *Glomar* response is appropriate, "the agency need not conduct any search for responsive documents or perform any analysis to identify segregable portions of such documents." *People for the Ethical Treatment of Animals v. Nat'l Institutes of Health, Dep't of Health & Human Servs.*, 745 F.3d 535, 540 (D.C. Cir. 2014).

**ARGUMENT**

Because the CIA has complied with its obligations under FOIA, it is entitled to summary judgment on Plaintiff's claim.  "Proper invocation of, and affidavit support for, *either* Exemption [1 or 3] *standing alone*, may justify the CIA's *Glomar* response."  *Wolf*, 473 F.3d at 375 (emphasis added).  Here, the CIA's response satisfies both exemptions.  Nor can Plaintiff bear his burden of showing that any exception to the *Glomar* doctrine applies; as relevant here, there has been no official acknowledgement of the classified intelligence information he seeks.

**A.  The CIA's *Glomar* Response Was Proper Under FOIA Exemption 1.**

The existence or non-existence of line-items entries in the intelligence budget pertaining to support for Israel is itself properly classified.  Accordingly the CIA's *Glomar* response was appropriate under Exemption 1.

**1.  The Scope of Exemption 1.**

Exemption 1 protects from disclosure records that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy, and (B) are in fact properly classified pursuant to such Executive Order."  5 U.S.C. § 552(b)(1).  An agency establishes that it has properly withheld information under Exemption 1 if it demonstrates that it has met the classification requirements of E.O. 13,526, the current Executive Order governing the classification of national security information.  "Agencies may establish the applicability of Exemption 1 by affidavit (or declaration)."  *Judicial Watch v. Dep't of Def.*, 715 F.3d 937, 940 (D.C. Cir. 2013).  Section 1.1 of the Executive Order sets forth four requirements for the classification of national security information:   (1) an original classification authority classifies the information; (2) the U.S. Government owns, produces, or controls the information; (3) the information is within one of eight protected categories listed in

section 1.4 of the Order;[2] and (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in a specified level of damage to the national security, and the original classification authority is able to identify or describe the damages.  E.O. 13,526 § 1.1(a).  As noted, the Court must accord "substantial weight" to agency affidavits concerning classified information, *King*, 830 F.2d at 217, and must defer to the expertise of agencies involved in national security and foreign policy, particularly to those agencies' articulations and predictive judgments of potential harm to national security, *see, e.g.*, *Larson*, 565 F.3d at 865; *Frugone*, 169 F.3d at 775; *Fitzgibbon*, 911 F.2d at 766.

### 2.   Exemption 1 Applies to the Classified Intelligence Information At Issue Here.

As supported in a declaration by Antoinette B. Shiner (the "Declarant"), the CIA has determined that the existence or nonexistence of intelligence budget line-item entries supporting Israel is currently and properly classified.  The Declarant's declaration satisfies the four criteria set out in Executive Order 13,526.

First, the Declarant "hold[s] original classification authority at the TOP SECRET level under written delegation of authority pursuant to section 1.3(c) of Executive Order 13526." Decl. of Antoinette B. Shiner, Info. Review Officer For The Litig. Review Office, Central Intelligence Agency ("Decl.") ¶ 3; *see also id.* ¶ 22; E.O. 13,526 § 1.1(a)(1).  Second, the sought "information is owned by, produced by or for, or is under the control of the United States

---

[2] Those categories are: "(a) military plans, weapon systems, or operations; (b) foreign government information; (c) intelligence activities (including covert action), intelligence sources or methods; or cryptology; (d) foreign relations or foreign activities of the United States, including confidential sources; (e) scientific, technological, or economic matters relating to national security; (f) United States Government programs for safeguarding nuclear materials or facilities; (g) vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to national security; or (h) the development, production, or use of weapons of mass destruction."  E.O. 13,526 § 1.4(a)-(h).

Government."   E.O. 13,526 § 1.1(a)(2).   Plaintiff seeks information about the budget of an agency of the United States, and that data is plainly within the control of the United States Government, a point to which the Declarant attests.  *See* Decl. ¶ 23.  Third, while the information must fall into at least one of eight categories of information set out in the Executive Order, E.O. 13,526 § 1.1(3), the Declarant avers that it falls into two: section 1.4(c), which covers "intelligence activities" and "intelligence sources and methods," and section 1.4(d), which encompasses the "foreign relations or foreign activities of the United States," Decl. ¶ 23

Fourth, and most importantly, the Declarant has determined that the "disclosure of the existence or nonexistence of [line item intelligence budget entries supporting Israel] could be expected to result in damage to national security."  Decl. ¶ 23; *see also* E.O. 13,526 § 1.1(4). The danger manifests in several ways.  First, "[d]isclosure of information about intelligence expenditures could reasonably be expected to harm national security because it would reveal capabilities, activities, and intelligence priorities of the U.S. Government, which in turn could inhibit intelligence gathering."  Decl. ¶ 27.  Plaintiff seeks information on specific intelligence budget line items supporting Israel, or, in other words, specific funded programs and activities by the CIA supporting Israel, in whatever form.  The simple fact is that budgets reflect priorities, and if the CIA was forced to identify the specific areas it spent money on (or did not spend money on), it "would reveal the resources available to the intelligence community and the intelligence priorities of the U.S. Government."  *Id.*  As the Declarant explained:

> Information about intelligence budgets has been and continues to be of great interest to foreign nations and hostile groups wishing to calculate the strengths and weakness of the United States.  Foreign governments and groups also have been and continue to be keenly interested in U.S. intelligence priorities.  Nowhere have these priorities been better reflected than in spending on particular intelligence activities.  Combined with other information already available to foreign intelligence services and the public, the release of intelligence budget

information would tend to reveal intelligence activities, priorities, vulnerabilities, and strengths.

*Id.* ¶ 28. Here, Plaintiff indeed seeks specific intelligence budgetary information – the CIA's intelligence budget line item entries supporting Israel – that would be very revealing of the CIA's interests and priorities related to Israel, *id.* ¶¶ 27, 28, and therefore very useful to adversaries interested in such information.

The CIA Declarant's reasoning is consistent with that of the Supreme Court, which has explained that disclosing "[t]he inquiries pursued by the [CIA] can often tell our adversaries something that is of value to them." *Sims*, 471 U.S. at 177; *see also id.* at 178 ("In this context, the very nature of the intelligence apparatus of any country is to try to find out the concerns of others; bits and pieces of data 'may aid in piecing together bits of other information even when the individual piece is not of obvious importance in itself.'") (quoting *Halperin*, 629 F.2d at 150). Indeed, in *Sims*, the Supreme Court was concerned that "disclosure of the fact that the Agency subscribes to an obscure but publicly available Eastern European technical journal" would unacceptably hinder intelligence activities, because adversaries could determine the "general nature" of Agency interests in developing new intelligence techniques. *Id.* at 177. Judged against that undemanding standard, it is certainly "logical or plausible" to conclude that disclosing classified information about which countries the CIA does or does not provide budgetary support to would reveal information about the intelligence priorities, capabilities, and interests of the Agency. *See Judicial Watch*, 715 F.3d at 941 (internal quotation marks omitted).

Next, as an independent justification, the CIA explained that the "disclosure of information about intelligence expenditures could reasonably be expected to damage relationships between the U.S. Government and foreign governments and could negatively impact the CIA's ability to work collaboratively with these countries on other areas of concern."

Decl. ¶ 29.   These foreign cooperative intelligence relationships, which "constitute both an

intelligence source and an intelligence method," *id.*, are important to national security, and as the

Declarant explained, depend on secrecy.

> The CIA relies on foreign intelligence liaison relationships for intelligence-
> gathering and assistance critical to U.S. national security.   One of the major
> functions of the CIA is to gather intelligence from around the world that can be
> used by the President and other government officials in making important
> decisions.   Disclosure of the Agency's relationship with or assistance to a specific
> country would suggest to other foreign liaison services and foreign government
> officials that have relationships with the Agency that the U.S. Government is
> unable or unwilling to protect the secrecy of such relationships and assistance.
> Such a perception could cause foreign liaison services and foreign governments to
> curtail their provision or information or other assistance to the Agency, or to end
> the relationship altogether, which would impair the Agency's ability to collect
> intelligence and conduct intelligence activities of importance to U.S. national
> security.

*Id.*   As the Supreme Court has recognized, "[s]ecrecy is inherently a key to successful

intelligence operations."   *Sims*, 471 U.S. at 172 n.16.   "If potentially valuable intelligence

sources come to think that the Agency will be unable to maintain the confidentiality of its

relationship to them, many could well refuse to supply information to the Agency in the first

place."   *Id.* at 175; *see also Fitzgibbon*, 911 F.2d at 763-64 ("[T]he Government has a

compelling interest in protecting both the secrecy of information important to our national

security and *the appearance of confidentiality* so essential to the effective operation of our

foreign intelligence service.").   That reasoning applies to the information at issue here: if

countries could not ensure that their intelligence relationships, including the existence or

nonexistence of budgetary "assistance," with the CIA remained secret, they would be less likely

to enter into such relationships – and that as the Declarant stated, would harm the national

security of the United States.   *See* Decl. ¶ 29.

Finally, as the Declarant explains, a judicial ruling that the CIA must confirm or deny the

existence of intelligence budget line-items would have enormous consequences on national

security.  "The potential damage to national security would be magnified many times over if the CIA were to respond to all FOIA requests for information on intelligence budget line items, thereby revealing – piece by piece – intelligence community resources, activities, and priorities." *Id.* ¶ 30.  Allowing a foreign adversary to get detailed information on the existence or non-existence of specific line-items would largely nullify the well-established *Sims* principle that intelligence priorities cannot be disclosed, as requestors could determine whether specific, suspected classified programs existed and were funded simply by making a FOIA request.

To conclude, the Declarant has explained how revealing information on whether the CIA has or does not have line-items in its budget supporting Israel would harm national security.  As the D.C. Circuit has held, the key issue in an Exemption 1 *Glomar* claim is whether the affidavit "plausibly explains the danger" to national security if the agency confirms or denies the existence of the materials in question.  *Wolf*, 473 F.3d at 375.  If it does, "the existence of records *vel non* is properly classified under [the Executive Order] and justifies the Agency's invocation of Exemption 1."  *Id.* at 375-76; *see also Cntr. for Nat'l Sec. Studies v. DOJ*, 331 F.3d 918, 927 (D.C. Cir. 2003) ("Moreover, in the FOIA context, we have consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review.").  Here, it is plausible to believe that revealing detailed, classified data about the CIA's budget would allow its adversaries to infer information about the Agency's priorities and capabilities.  It is also plausible to believe that foreign countries would be less likely to cooperate with the CIA if their relationships with the Agency became public knowledge.  And so long as the CIA's assertions are logical or plausible – as they are here – under D.C. Circuit case law, the Agency's *Glomar* response must be upheld.

**B. The CIA's *Glomar* Response Was Also Independently Proper Under FOIA Exemption 3.**

The CIA has also properly asserted FOIA Exemption 3 in support of its *Glomar* response. *See Larson*, 565 F.3d at 862-63 (Exemption 3 is sufficient to justify an agency's *Glomar* response). This exemption bars from disclosure information that Congress has required by statute to be "withheld from the public." 5 U.S.C. § 552(b)(3). Here, the National Security Act of 1947 prohibits the Agency from confirming of denying the existence of the information Plaintiff seeks.

**1. The Scope of Exemption 3.**

Exemption 3 protects from disclosure information that is protected by a separate statute, "provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (b) establishes particular criteria for withholding or refers to particular types of matters to be withheld." *Id.* The "purpose of Exemption 3 [is] to assure that Congress, not the agency, makes the basic nondisclosure decision." *Ass'n of Retired R.R. Workers*, 830 F.2d at 336; *see also id.* ("[T]he policing role assigned to courts in a[n Exemption 3] case is reduced.").

Following the Supreme Court's decision in *Sims*, courts apply a two-pronged inquiry when evaluating an agency's invocation of Exemption 3. *See Sims*, 471 U.S. at 167-68. First, the court must determine whether the statute qualifies as an exempting statute under Exemption 3. Second, the court decides whether the withheld material falls within the scope of that exempting statute. *See id.*

**2. The National Security Act of 1947.**

The CIA relies on section 102A(i)(1) of the National Security Act of 1947 (the "Act"), which requires that "[t]he Director of National Intelligence shall protect intelligence sources and

methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1); *see also* Decl. ¶ 32. The Act is

an exempting statute for the purposes of Exemption 3, so the CIA has satisfied the first of *Sims'*

two requirements. *See, e.g.*, *Am. Civil Liberties Union v. U.S. Dep't of Defense* ("*ACLU*"), 628

F.3d 612, 619 (D.C. Cir. 2011); *Larson*, 565 F.3d 857, 865 (D.C. Cir. 2009); *see also Leopold*,

106 F. Supp. 3d at 57 (applying section 102(A)(i)(1) to the CIA).

Sims' second requirement is also satisfied here, as the CIA's *Glomar* response falls

comfortably within the expansive scope of section 102A(i)(1)'s protection of "intelligence

sources and methods." The Supreme Court has recognized the "broad sweep of [section

102A(i)(1)'s] statutory language," as well as the lack of any "limiting language." *Sims*, 471 U.S.

at 169; *see also id.* at 169-70 ("Congress simply and pointedly protected all sources of

intelligence that provide, or are engaged to provide, information the Agency needs to perform its

statutory duties with respect to foreign intelligence. The plain statutory language is not to be

ignored."). And this Circuit has gone even further in reading section 102(A)(i)(1) expansively.

As Judge Boasberg recently summarized:

> The D.C. Circuit has interpreted this provision broadly, holding that material is
> properly withheld under the Act if it "*relates* to intelligence sources and
> methods," or "can reasonably be expected to lead to unauthorized disclosure of
> intelligence sources and methods." Courts have also recognized that the Act's
> protection of sources and methods is a "near-blanket FOIA exemption," which
> includes the "power to withhold superficially innocuous information on the
> ground that it might enable an observer to discover the identity of an intelligence
> source [or method]." This is so because in the intelligence context "bits and pieces
> of data may aid in piecing together bits of other information even when the
> individual piece is not of obvious importance in itself." The Supreme Court has
> also warned that "it is the responsibility of the [intelligence community], not that
> of the judiciary, to weigh the variety of complex and subtle factors in determining
> whether disclosure of information may lead to an unacceptable risk of
> compromising the . . . intelligence-gathering process."

*Leopold*, 106 F. Supp. 3d at 57-58 (internal citations omitted). Indeed, the mandate to withhold

information pursuant to the National Security Act is broader than the authority to withhold

information pursuant to FOIA Exemption 1 and Executive Order 13,526. *Cf. Gardels*, 689 F.2d at 1107. This is so because unlike section 1.1(a)(4) of E.O. 13,526, the National Security Act does not require the CIA to determine that the disclosure of the information would be expected to result in damage to national security. *Compare* 50 U.S.C. § 3024(i)(1), *with* E.O. 13,526 § 1.1(a)(4).

Revealing intelligence budgets – including the existence or non-existence of intelligence budget line items – reveals information on "intelligence sources and methods" that Congress has exempted from disclosure. As the CIA Declarant states "acknowledging the existence of records reflecting a classified connection to the CIA would reveal information that concerns intelligence sources and methods, which the National Security Act is designed to protect." Decl. ¶ 32; *see also id.* ¶¶ 26-30, 33-34. Indeed, as explained in more depth in the Exemption 1 section, intelligence budget line items "can reveal specific intelligence capabilities, authorities, interests, and resources." *Id.* ¶ 26; *see also id.* ¶ 25 (acknowledging that the CIA does or does not have intelligence budget line items supporting Israel "would implicate intelligence sources and methods in a manner harmful to U.S. national security"); *Int'l Counsel Bureau v. CIA*, 774 F. Supp. 2d 262, 274 (D.D.C. 2011) (concluding that the same discussion of harms to intelligence sources used to support an Exemption 1 claim also support an Exemption 3 claim).

The CIA's declaration is supported by this Circuit's case law, which has concluded that information about intelligence budgets goes directly to intelligence sources and methods. In *Leopold*, for example, the court concluded that releasing information on CIA line item budgets "could shed light on the funds that were available for particular activities, which could, in turn, divulge the agency's capabilities and priorities." 106 F. Supp. 3d at 58. So too here: knowing whether or not the intelligence budget includes line-items "supporting Israel" necessarily

indicates the Agency's priorities (or lack thereof) – and the sources and methods necessary to support those priorities.  The D.C. Circuit has embraced this reasoning.  In *Halperin v. CIA*, 629 F.2d 144 (D.C. Cir. 1980), the CIA refused to disclose information on the fees paid to its attorneys, arguing that "such information could give leads to information about covert activities that constitute intelligence methods."  *Id.* at 150.  The D.C. Circuit agreed, concluding "that each individual piece of intelligence information, much like a piece of jigsaw puzzle, may aid in piecing together other bits of information even when the individual piece is not of obvious importance in itself."  *Id.*; *see also Sims*, 471 U.S. at 178 ("[W]hat may seem trivial to the uninformed, may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in its proper context.") (internal citation omitted); *Military Audit Project v. Casey*, 656 F.2d 724, 750 (D.C. Cir. 1981) (costs can reveal information about "intelligence capabilities and purposes.").  In this case, knowing that the CIA has (or does not have) line item entries in its budget supporting Israel would provide information about the activities of the Agency, as funding (or not funding) supportive intelligence activities is itself an intelligence method.

    Indeed, courts within this Circuit have held that the *aggregate* "intelligence budget information relates to intelligence methods, namely the allocation, transfer, and funding of intelligence programs."  *Afterwood v. CIA*, 355 F. Supp. 2d 557, 562 (D.D.C. 2005) (internal quotation marks omitted).  Disclosing the existence or non-existence of *line-item* budget information would sweep far beyond disclosing total budget information, and would allow for individuals and foreign entities to draw conclusions on methods of gathering intelligence by the existence or non-presence of budgetary support.  It also would provide information on the relative connections between foreign intelligence agencies, which necessarily implicates

intelligence sources and methods.  *See Elec. Privacy Info. Cntr. v. Office of the Director of Nat'l Intelligence*, 982 F. Supp. 2d 21, 30 (D.D.C. 2013) ("There is little doubt that the names of particular datasets and the agencies from which they originate would allow interested onlookers to gain important insight *into the way ODNI and its partners operate*.") (emphasis added).  The CIA has asserted harm to intelligence sources and methods, Decl. ¶ 25, and "the CIA's assertions of harm to intelligence sources and methods under the National Security Act are accorded great deference."  *Int'l Counsel Bureau*, 774 F. Supp. 2d. at 274; *see also Whitaker v. CIA*, 64 F. Supp. 3d 55, 63-64 (D.D.C. 2014).

### C. The CIA Has Never Specifically Disclosed The Existence or Non-Existence of Intelligence Budget Line Items Pertaining to Israel.

In his complaint, Plaintiff has suggested that the *Glomar* doctrine does not apply to the facts of this case.  He is wrong.  The D.C. Circuit has recognized that an agency is foreclosed from providing a *Glomar* response when an agency has already officially disclosed the particular information in question.  But that situation does not exist here.

It is well-settled law "that when an agency has officially acknowledged otherwise exempt information through prior disclosure, the agency has waived its right to claim an exemption with respect to that information.  *ACLU*, 710 F.3d at 426.  This "official acknowledgement" principle applies in the *Glomar* context, and "the plaintiff can overcome a *Glomar* response by showing that the agency has already disclosed the fact of the existence (or nonexistence) of responsive records, since that is the purportedly exempt information that a *Glomar* response is designed to protect."  *Id.* at 427.  The plaintiff "must bear the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld."  *Id.* (quoting *Wolf*, 473 F.3d at 378).

16

The D.C. Circuit has narrowly construed the "official acknowledgment" principle, however, and the plaintiff must satisfy three stringent criteria.

"First, the information requested must be as specific as the information previously released." *Wolf*, 473 F.3d at 378 (quoting *Fitzgibbon*, 911 F.2d at 765). "Prior disclosure of similar information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain by official disclosure. The insistence on exactitude recognizes 'the Government's vital interest in information relating to national security and foreign affairs." *Id.* (quoting *Public Citizen v. Dep't of State*, 11 F.3d 198, 203 (D.C. Cir. 1993); *Competitive Enter. Inst. v. NSA*, 78 F. Supp. 3d 45, 54 (D.D.C. 2015) ("Plaintiffs in this case must therefore point to specific information in the public domain establishing that the NSA has [the claimed information.]"). The documents already released must also be of the same level of generality as the ones sought – broadly crafted disclosures, even of the same topic, do not waive the *Glomar* privilege. *See, e.g.*, *Afshar v. Dep't of State*, 702 F.2d 1125, 1133 (D.C. Cir. 1983) (previous disclosure that plaintiff had 'created a problem' in U.S.-Iranian relations" was too general to justify releasing documents detailing the nature of that problem).

"Second, the information requested must match the information previously disclosed." *Wolf*, 473 F.3d at 378 (quoting *Fitzgibbon*, 911 F.2d at 765). If there are "substantive differences" between the two, an official acknowledgment claim must fail. *ACLU*, 628 F.3d at 621. That is true even if the previous disclosures are on the same topic. *See, e.g.*, *Competitive Enter. Inst.*, 78 F. Supp. 3d at 57 (Presidential statement that "the intelligence community . . . is looking at phone numbers and duration of calls," was not adequately congruent with a request seeking the companies that had provided that data to U.S. intelligence agencies); *Wolf*, 473 F.3d

at 379 (holding that CIA could not claim *Glomar* protection when it had previously read excerpts from materials sought into the record during congressional hearing).

"Third, . . . the information requested must already have been made public through an official and documented disclosure." *Id.* at 378 (quoting *Fitzgibbon*, 911 F.2d at 765). Key to this element is that the source must be *official*; non-governmental releases, or even anonymous leaks by government officials, do not qualify. *See, e.g.*, *Am. Civil Liberties Union v. Dep't of Defense*, 628 F.3d 613, 621-22 (D.C. Cir. 2011); *Agility Public Warehousing Co. K.S.C. v. NSA*, No. 14-cv-0946, 2015 WL 4183443, at *10 n.8 (D.D.C. July 10, 2015); *Competitive Enter. Inst.*, 78 F. Supp. 3d at 55. "[M]ere speculation, no matter how widespread," is not enough. *Wolf*, 473 F.3d at 378.

Plaintiff has not met his burden of pointing to an official disclosure of the information he seeks. In his complaint, Plaintiff points to two purported official acknowledgments by the CIA confirming or denying that there are intelligence budget line items supporting Israel. Neither one suffices. First, Plaintiff states: "In 1996 Congressional testimony by then-Director of Central Intelligence John Deutch testified that 'the President is persuaded that disclosure of the annual amount appropriated for intelligence purposes will inform the public and not, in itself, harm intelligence activities.'" Compl. ¶ 5. Even assuming this is an accurate quotation – and there is no citation whatsoever – the assertion fails to pass official acknowledgement muster. The quotation discusses only the aggregate intelligence budget, not intelligence budget line items. Nor does it mention Israel at all. It therefore fails both the specificity and matching prongs set out by the D.C. Circuit.

Next, Plaintiff points to a speech by President Obama, where he said: "But the fact is, partly due to American military and intelligence assistance, which my administration has

provided at unprecedented levels, Israel can defend itself against any conventional danger." Compl. ¶ 26.  This statement, however, references only general "American military and intelligence assistance" to Israel, without any mention of (1) whether this assistance was in the form of budgetary support, (2) if so, whether there were line-items reflecting said support in the intelligence budget, and (3) which agency provided the support.  Nor does the President's statement that this unspecified assistance was at "unprecedented levels" provide the level of specificity required to constitute a waiver.  These broad Presidential statements cannot overcome an agency's proper *Glomar* response to a specific, narrow FOIA request.  *See Competitive Enter. Inst.*, 78 F. Supp. 3d at 57 (general Presidential statements do not waive CIA's ability to issue a *Glomar* response, even if they are on the same topic as that at issue).  In short, Plaintiff has not pointed to any official documents in the public record which indicate that the CIA has previously confirmed or denied the existence of intelligence budget line-items supporting Israel.

## CONCLUSION

For the foregoing reasons, this Court should grant Defendant's motion for summary judgment.

February 5, 2016                              Respectfully Submitted,

                                           BENJAMIN C. MIZER
                                           Principal Deputy Assistant Attorney General,
                                           Civil Division

                                           CHANNING D. PHILLIPS
                                           United States Attorney

                                           MARCIA BERMAN
                                           Assistant Director,
                                           Federal Programs Branch

                           *By:*     /s/ *Joseph E. Borson*
                                           JOSEPH E. BORSON
                                           Virginia Bar No. 85519

Trial Attorney
U.S. Department of Justice,
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, D.C. 20530
Telephone:       (202) 514-1944
Facsimile:       (202) 616-8460
E-mail:          joseph.borson@usdoj.gov

*Counsel for Defendant*