UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GRANT F. SMITH

Plaintiff,

v. Civil No. 1:15-cv-01431

CENTRAL INTELLIGENCE AGENCY

Defendant.

**MEMORANDUM IN OPPOSITION TO DEFENDANT MOTION FOR SUMMARY JUDGEMENT**

The Defendant in this Freedom of Information Act (FOIA) case, the Central Intelligence Agency, insinuates that the Plaintiff's effort to seek judicial review of his request was in some way premature. The Defendant claims the CIA faithfully abides by FOIA processing statutes and Court precedent. The Defendant asserts that somehow fact that there is any such budget as intelligence support for Israel somehow remains a secret. It makes this bald claim even though the President of the United States—the CIA's own commander-in-chief as much as over all branches of the military—has higher declassification authority than the CIA and disclosed the existence of "unprecedented" intelligence support—ultimately funded by U.S. taxpayers. The Defendant mischaracterizes an important precedent set in the court-ordered disclosure of CIA budget line items as justification for keeping a shroud of secrecy over yet another budget line item of intense public interest. Public interest in the CIA budget for Israel exists because that budget under existing U.S. statutes (the Symington and Glenn Amendments) is illegal; much as clandestine CIA support

for the Nicaraguan Contras violated the Boland Amendments. The Defendant's invocation of a "Glomar" response and citation of FOIA exemptions are therefore unconvincing. The Defendant should be compelled to provide the information sought by the Plaintiff for *in camera* review and release.

The Defendant's invocation of the so-called Glomar response, though inappropriate, is oddly symbolic. The USNS Hughes Glomar Explorer was a ship built in 1971 under CIA's Project Azorian to recover the Soviet submarine K-129 which sank in 1968. The CIA spent $1.68 billion in a no-bid contract to build the massive, sole-purpose ship. Its cover story was that it would "extract manganese nodules" from the ocean floor. The nautical boondoggle ultimately failed. During an attempt to winch the K-129 to the surface, it broke up, and the most-sought items such as codebooks and nuclear missiles were lost. The vessel reflagged the GSF Explorer then roamed the seas like an albatross, searching for a buyer and new purpose. The massive amounts paid to build and sail the vessel were never recouped and in 2015 it was announced the ship would be sold for scrap. Subsequently CIA "boilerplate" refusals to properly respond to public interest FOIA requests about publicly known programs became known as "Glomar" responses. Essential details of Project Azorian were disclosed in the news media, starting with reporter Jack Anderson in the mid-1970's who claimed, "Navy experts have told us that the sunken sub contains no real secrets and that the project, therefore, is a waste of the taxpayers' money."[1] The CIA refused to release any of its own files about the failed operation until 2010.[2] However, given the history of Project

[1] Robarge, David (March 2012). "The Glomar Explorer in Film and Print" *Studies in Intelligence* 56 (1): 28–29.
[2] *Intelligence in Public Literature: The Glomar Explorer in Film and Print, CIA Website, posted May 2, 2012 https://www.cia.gov/library/center-for-the-study-of-intelligence/csi-publications/csi-studies/studies/vol.-56-no.-1/the-glomar-explorer-in-film-and-print.html*

Azorian, a "Glomar" response should be a red flag the possible existence of an illegal, ill-advised, failed or financially questionable operation that CIA wishes to cover up in order to avoid accountability.

The Plaintiff rejects the Defendant's insinuation that his resort to the court was somehow premature. In DCKT 12-1, the Defendant states "Plaintiff filed an administrative appeal on May 5, 2015, id., Ex. 3, which the CIA docketed on May 15, 2015, id., Ex. 4. On September 2, 2015, before the administrative appeal process was completed, Plaintiff filed this lawsuit." The Defendant obviously assumes that all administrative appeals are subject to however much time the CIA wishes to consume.

In fact, the CIA was required to make a "determination" on the merits of the FOIA appeal within 20 working days of receipt. 5 U.S.C. § 552(a)(6)(A)(ii). The agency must also "immediately notify the person making such request of the provisions for judicial review of that determination." The CIA did neither, and because it routinely fails to comply with FOIA deadlines, taking years to respond to relatively straightforward requests, reasonable efficiency gave the Plaintiff no choice other than to file suit given the pressing public interest concerns over the existence of a massive secret intelligence budget for Israel.

The Defendant claims that its Glomar response was appropriate, though admitting, "That said, the Glomar doctrine is not without limits, and a 'plaintiff can overcome a Glomar response by showing that the agency has already disclosed the fact of the existence (or nonexistence) of responsive records, since that is the purportedly exempt information that a Glomar response is designed to protect.'" (Dkt 12-1, pages 3-4)

The Defendant also cites the executive's insights into "what adverse effects might

occur as a result of public disclosure of a particular classified record." However, rather than exploring, or even more convincingly, submitting actual affidavits from the Executive (e.i., the U.S. President) the defendant submits low ranking agency official affidavits generically alleging potential harm to national security and advancing theoretical cases of such harm.

However, the ultimate authority over the CIA,"the executive," and the elected official to whom the CIA reports, has already determined that such information is releasable. This executive affidavit took the form of an August 5, 2015 presidential speech at American University. It may be consulted on the website of the White House.[3]

The President stated that his administration was providing unprecedented levels of military and intelligence assistance to Israel. The president—higher in the classification hierarchy than the CIA—did not apparently believe that openly acknowledging the existence of "unprecedented" intelligence support to Israel was in any way disclosing some great national secret. He even provided benchmarks for analysts to begin to independently estimate what amount the total secret—yet possibly illegal—intelligence budget might be.

The Defendant complains that this statement could not possibly signify "assistance in the form of budgetary support…whether there were line-items…and…which agency provided support." This is simply not a serious response. The Central Intelligence Agency, as the name implies, was created as the centralized authority for the conduct and coordination of intelligence activities. While it does not always succeed in this complicated mandate, it would, within the function of its mandate have ready access financial information about any "unprecedented" intelligence support to Israel readily available. To

[3] https://www.whitehouse.gov/the-press-office/2015/08/05/remarks-president-iran-nuclear-deal

assert otherwise, the Defendant would be claiming that the CIA is incompetent, and not really the "Central" agency it was set up to be.

The CIA appears to claims that it, not the president, is the only bona fide declassification authority, stating, "general Presidential statements do not waive CIA's ability to issue a Glomar response, even if they are on the same topic as that at issue." (Dkt 12-1 page 20) Perhaps the CIA feels it is advisable to impinge its own credibility by such denials even after clear and unambiguous presidential statements. The Court should take that under advisement in its assessment of good faith. The Plaintiff believes it is an exercise of bad faith.

However, it cannot be denied that whatever the Defendant believes or asserts, the CIA is not on par with the President on matters of declassification. The CIA unjustifiably labels to be secret matters of national security toward which all Americans must continue to exhibit a high level of deference. The information requested should be put into the public domain information because "…the President has the authority to declassify anything."[4] If the president publicly states that unprecedented levels of military and intelligence support are being provided to Israel, he has *de facto* declassified the existence of intelligence budget line items for support destined to Israel—because CIA is the agency responsible for coordinating that type of activity. CIA cannot credibly deny that budget line items exist, because the U.S. federal government is a budget-oriented entity. Because such a budget exists, its top line may be found in one or more CIA reports that can be redacted and released.

The President Barak Obama asserted his right to declassify information and this right

[4] Noah Shachtman, "Obama finally talks drone war, but it's almost impossible to believe him" Wired, September 6, 2012.

is underscored the declassification hierarchy within Executive Order 13526-Classified National Security Information:

"Sec. 1.3. Classification Authority.(a) The authority to classify information originally may be exercised only by: (1) the President and the Vice President; (2) agency heads and officials designated by the President; and (3) United States Government officials delegated this authority pursuant to paragraph (c) of this section."

Contrary to what the Defendant asserts, the Plaintiff need not have "pointed to any official documents in the public record which indicate that the CIA has previously confirmed or denied the existence of intelligence budget line-items supporting Israel." If the President states there is "unprecedented" intelligence support being provided it logically follows, given the current configuration of the U.S. federal government, that CIA has the information requested. The only remain question for the American public, many of whom believe such aid is illegal, are paying to provide such support.

The disclosure of the CIA's topline dollar amounts to Israel is a public interest matter that, since the President does not consider its existence a secret, should quickly lead to the disclosure of the requests dollar amounts for years 1990-2015. This was the path taken in court over the most applicable precedent, the release of the overall U.S. intelligence budget numbers.

The Defendant incorrectly states "In his complaint, Plaintiff points to two purported official acknowledgments by the CIA confirming or denying that there are intelligence budget line items supporting Israel. Neither one suffices." In fact, the Plaintiff pointed to one statement by a subordinate, the Director of Central Intelligence, on the need for

financial disclosure to the public it claims to serve. (DKT Document 12-1 page 18) The second statement was by a higher authority than the CIA, that is, the sitting U.S. president to whom CIA reports, and who retains a higher classification/declassification authority than any other entity.

The Defendant attempts to cast doubt on information the Plaintiff referenced in his original FOIA request, stating, "First, Plaintiff states: 'In 1996 Congressional testimony by then-Director of Central Intelligence John Deutch testified that 'the President is persuaded that disclosure of the annual amount appropriated for intelligence purposes will inform the public and not, in itself, harm intelligence activities.'" Compl. ¶ 5. Even assuming this is an accurate quotation – and there is no citation whatsoever – the assertion fails to pass official acknowledgement muster."

The Plaintiff graciously advises the Defendant of the confirmed existence of a global computing network known as "the Internet." A ten-second Google search quickly reveals, on the website of Congress.gov, that CIA Director Deutch in fact made the cited statement.[5] Moreover, the DCI went on to urge more financial transparency, given huge public doubts that the CIA was exercising proper custodianship over the tax dollars entrusted to it.

The Defendant splits hairs over whether Deutch's remarks about budgetary disclosure can be applied in this case. They can. As cited previously using polling data, Americans have grave concerns about the amount of foreign aid being provided to Israel, with most believing it is "too much." The plaintiff's FOIA request was, in fact for an aggregate intelligence budget, not for America, but for Israel, being funded by U.S.

[5] Intelligence Authorization Act for Fiscal Year 1997, US House of Representatives, May 22, 1996 https://www.congress.gov/congressional-record/1996/5/22/house-section/article/h5389-2

taxpayers.

The Defendant claims "Indeed, courts within this Circuit have held that the aggregate 'intelligence budget information relates to intelligence methods, namely the allocation, transfer, and funding of intelligence programs.' *Aftergood v. CIA*, 355 F. Supp. 2d 557, 562 (D.D.C. 2005) (internal quotation marks omitted)." This is a poor choice of citations because it proves precisely the opposite of what the Defendant contends. The lessons from *Aftergood v. CIA* are that such numbers can be—and in fact were—released because the public interest outweighed CIA theories of grave harm to national security advanced by its low level officials. Steven Aftergood published such CIA budget information extracted by court order at the Federation of American of American Scientists website. Americans could thereafter measure whether their dollars were being well spent in light of such fiascos as 9/11 and CIA intelligence used to justify, on the basis of nonexistent weapons of mass destruction, the invasion of Iraq. Aftergood's Freedom of Information Act lawsuit against the Central Intelligence Agency led to the declassification and publication of the U.S. government's total intelligence budget ($26.6 billion in 1997) for the first time in fifty years.

In addition to being illegal under the Symington and Glenn Amendments, the CIA's intelligence support to Israel must be massive and amount to billions of dollars. The public interest in understanding how such unpopular, and harmful, financial support for a major and ongoing espionage threat to the U.S. is being funneled through CIA outweighs any claims of harm to national security. Israel is dependent upon the United States, not the reverse.

In order for combined Obama administration intelligence and military support to

Israel to be "unprecedented" it must be assumed to surpass all previous highs. Year 2015 foreign aid to Israel, which was mostly military aid, was the highest single line item in the entire foreign aid budget amounting to $3.115 billion.[6] Without adjusting for inflation, the previous high was $4.999 billion in the year 1979, implying that the 2015 US intelligence support cited by President Obama and funneled through the CIA was at least $1.884 billion. ($4.999 billion previous high minus $3.115 billion 2015 aid). Or, if President Obama was referring to inflation-adjusted figures, U.S. intelligence support to Israel may have reached $13.205 billion ($4.999 billion in 2015 dollars inflation adjusted to $16.320 billion minus $3.115 billion).[7]

The Central Intelligence Agency has filed no proof of any interaction with its higher declassification authority, the U.S. President, in upholding its invocation of FOIA exemptions. The U.S. president has publicly put U.S. intelligence support for Israel on the table. The U.S. President's declassification authority outranks CIA's declassification authority. Following the precedent of *Aftergood v CIA*, the CIA should now either release the topline budget information requested, or submit affidavits from the Office of the President that such information, while confirmed to exist, cannot be released. The Defendant has done neither. Instead it submits allegedly authoritative assertions by CIA employees far down the hierarchical chain of command, while upholding the unconvincing—yet again, oddly appropriate from a historical standpoint—façade of Glomar.

Therefore, the court should deny summary judgement to the Defendant and obtain

---

[6] Jeremy Sharp, "U.S. Foreign Aid to Israel" June 10, 2015, page 29 https://www.fas.org/sgp/crs/mideast/RL33222.pdf

[7] Adjusted using the Bureau of Labor Statistics CPI Inflation Calculator http://data.bls.gov/cgi-bin/cpicalc.pl?cost1=4%2C999.00&year1=1979&year2=2015

and review *in camera* the requested information and release it to the Plaintiff.

Dated March 4, 2016

Respectfully submitted,

Grant F. Smith, Pro Se
4101 Davis PL NW #2
Washington, DC 20007
(202) 640-3709