UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GRANT F. SMITH

        Plaintiff,

    v.                  Civil No.  1:15-cv-01431 (TSC)

CENTRAL INTELLIGENCE AGENCY

        Defendant.

## PLAINTIFF'S OPPOSITION TO DECLARATION OF ANTOINETTE B. SHINER, INFORMATION REVIEW OFFICER FOR THE CIA LITIGATION INFORMATION REVIEW OFFICE

Plaintiff Grant F. Smith respectfully opposes Defendant Central Intelligence Agency's declaration as inaccurate, irrelevant, out of compliance with FOIA statutes, vastly outranked by a higher classification authority, overly theoretical, improper citation of selective sections of Executive Orders, of little to no applicability to this action, of questionable veracity, incomplete and lacking proper reference to truly applicable sections of Executive orders.

1. Undisputed.

2. Undisputed.

3. Disputed/omissions. The Plaintiff urges the court to recognize that Shiner's classification authority does not outrank the authority of the President under Executive Order 13526. Neither does her authority, nor that of any CIA official even up to the level of Director of Central Intelligence, or DCI, outrank the authority of

the President. Failure to acknowledge this very relevant ordination is a grave omission.

4. Disputed/major omissions. The Plaintiff notes the Defendant's omission of the 1984 CIA Information Act §3141. Operational files of the Central Intelligence Agency, which institutionally the agency misrepresents and fails to comply with, even when ordered to do so by a court, as discussed later.

5. Undisputed.

6. Undisputed.

7. Disputed. The FOIA request actually solicited "a copy of the intelligence budget that pertains to line items supporting Israel."

8. Undisputed.

9. Disputed. This implies that the Plaintiff mentioned DCI John Deutch for the first time in his May 5, 2015 appeal. In fact, the Plaintiff referenced DCI Deutch's declaration in his original FOIA request on March 19, 2015. See the letters attached as exhibits in the original complaint filing.

10. Disputed. As the May 15, 2015 CIA acknowledgement reveals, the Defendant attempted to twist the FOIA request denial into an exercise to determine the applicability of a Glomar response, which was not what the Plaintiff asked for in his appeal. Specifically, the CIA's acknowledgement stated, "You are appealing our initial-level determination to neither confirm nor deny you material responsive to your request." The Plaintiff's May 5, 2015 appeal was silent on Glomar, as the Plaintiff did not then, nor does he now, have any doubt about the existence of a

budget due to declarations of a higher declassification authority (the U.S. President). However, the CIA acknowledgement did serve as an early warning that the Defendant was twisting the intent of the administrative FOIA case, and possibly intending to delay, necessitating litigation on the matter.

11. Disputed. A more accurate statement would be, "Statutorily, The Agency Release Panel had 20 working days, until June 15, to meet its obligations to respond to the FOIA request. The Agency Release Panel failed to meet its statutory obligations. Months later, the action was filed."

12. Disputed. Given the affirmation of a higher classification authority, the U.S. President, the Glomar response is inapplicable. The existence of CIA intelligence budget line items for Israel is undeniable. The only remaining question is how much is at the top line for the years requested. The Defendant cites a lower section of Executive Order 13526, (3.6 (a)) without acknowledging the clear authority the President to exercise a declassification of the "secret" of intelligence support to Israel, which he, in fact, exercised under Section 1.3, Classification Authority. Given the fact that such aid to Israel is illegal under Symington and Glenn Amendments to the Foreign Aid Act, another section of Executive Order 13526, 1.7 Classification Prohibitions and Limitations also applies. (a) In no case shall information be classified, continue to be maintained as classified, or fail to be declassified in order to (1) conceal violations of law, inefficiency, or administrative error."

13. Disputed. Given the fact that Israel is both a top aid recipient and Counter Intelligence threat to the United States (ranked by the intelligence community right

after China, Russia, and Iran[1], public accountability watchdogs are right to want to know how much support taxpayers are providing to a country that routinely steals critical national defense and industrial secrets from the United States. Also, the Defendant omits other activities in which it has engaged, such as MKULTRA, and an illegal torture program. These activities were carried out as clandestine programs. The CIA claimed divulging such program details would harm national security. In fact, the programs were illegal. Their disclosure represented a paving stone in the road to accountability. History reveals it was the CIA programs that were endangering national security, and not the disclosure of its secret programs. History teaches that disclosure of such activities is a far more important means to ensure national security (by preserving the confidence and informed consent of the governed) than unbroken decades of spurious secrecy.

14. .Disputed. While the CIA often tells courtrooms that it has *bona fide* review procedures in place, there are many examples of how the agency has destroyed, even after a court order mandating release, information it independently determined to be "bad news." Whether it ever employs the procedures it claims to use is an open question to the Plaintiff. (See Smith v CIA 1:185-cv-00224 dkt 18-1 for an elaboration on this subject). In the present case, the fact of record existence is academic, not a state secret.

15. The confirmation that the US provides intelligence aid to Israel has already been established. The disclosure of how much it actually is could jeopardize its

---

[1] Inside the 2013 U.S. intelligence 'black budget', word search "Israel", Top Secret National Intelligence document. http://apps.washingtonpost.com/g/page/national/inside-the-2013-us-intelligence-black-budget/420/

continuance, since it is illegal. Therefore, the true issue in this action is that by complying with FOIA and applicable Executive Orders, an illegal activity could be disclosed. This is because, as stated under Executive Order 13526, 1.7 Classification Prohibitions and Limitations, the CIA may not withhold the amount simply because it wishes to continue breaking the law. Keeping such numbers secret will eventually lead to disillusionment of the American public. This disillusionment over federal agency corruption and secrecy is the actual true long-term threat to national security.

16. Disputed. This hypothetical case, while not doubt constantly filed as helpful boilerplate in FOIA cases, does not apply to this action.

17. Disputed. Ibid.

18. Disputed. Evoking Glomar in the face of a clear factual Presidential declaration viewed by thousands of students and millions of TV viewers could not possibly build up CIA's credibility or views of its effectiveness. As stated in this filing, Glomar itself, a failed, no-bid intelligence boondoggle is a fine example of how more open government could be accountable when spending hundreds of millions on failed projects, the public oversight role intended by FOIA were honored.

19. Disputed. A higher classification authority outranks the CIA reviewer's determination.

20. Disputed. Using his authority under EO 13526 the U.S. President has made the existence of the records public. Previous courtroom determinations that topline budget numbers won't harm US national security, but could aid accountability, make this information releasable.

21. Disputed. In fact EO 13526 reveals how CIA's review is outranked. It also prohibits retention of material as "classified" when the only function of such secrecy is covering unlawful behavior and embarrassment.

22. Disputed. Outranked by the authority that declassified the existence of the data sought.

23. Disputed. EO 13526 reveals how CIA's determination is outranked. It also prohibits retention of material as "classified" when the only function of such secrecy is covering unlawful behavior and embarrassment.

24. Disputed. The Plaintiff has provided compelling information about which statutes the intelligence aid violates. The Defendant has essentially conceded this by failing to address the Plaintiffs citation of Symington and Glenn questioning how such intelligence aid could possibly be legal under the law. It is the Plaintiff's assertion that the secrecy over the topline budget is a function of a desire to continue violating the clear language of the Act. The court should not allow this charade to continue. It is the function of FOIA to allow citizens to obtain information to better understand and challenge such corruption.

25. Disputed. CIA's acknowledgement is immaterial, the President has already put the issue into the public domain, from which it cannot be retracted by the CIA.

26. Disputed. Covert operations may be a function many CIA employees and officials revere, but they are not the mission of the CIA. Providing actionable and accurate information is the mission of the agency. The CIA's own plainspoken website for children is authoritative on this point, as well as its subordinate position with respect

to the U.S. President: "The employees of the CIA provide intelligence (or information) to the President, the National Security Council, and all other government officials who make and carry out US national security policy. We do not make policy or even make policy recommendations. That's the job of the US executive branch, such as the State Department or the Defense Department. We provide these leaders with the best information possible to help them make policy involving other countries."[2]

27. Disputed. The Central Intelligence Agency, as DCI Deutch testified, benefits when its expenditures are well understood by those paying for its budget.

28. Disputed. Foreign adversaries can be trusted to assume and make their own judgements about intelligence support, perhaps as a percentage of military aid provided by the U.S. The release of numbers of a top counterintelligence threat (Israel), which possesses its own clandestine nuclear weapons arsenal made with knowhow and material stolen from the US, would allow the public to better understand the functions of government, and its failure to deal with the situation.

29. Disputed. Foreign liaisons with Israel, which is the country that matters in this action, are those of a patron to client. Israel provides nothing of value to the United States, as stated by one of the CIA's own top Middle East analysts, Michael Scheuer.[3] On the contrary, Israeli intelligence operations relentlessly plunder U.S. secrets while agitating for the U.S. to fight wars that are in the interest of Israel, but not the United States.

---

[2] Kids' Zone - Our Mission. "https://www.cia.gov/kids-page/6-12th-grade/who-we-are-what-we-do/our-mission.html"
[3] Joshua Cohen "I'd Dump the Israelis Tomorrow" *Times of Israel*, October 23, 2013
http://blogs.timesofisrael.com/id-dump-the-israelis-tomorrow-ex-cia-analyst-michael-scheuer/

In short, that the U.S. has something valuable at stake, that could be lost if the intelligence budget were publicly released, is entirely unconvincing to informed Americans.

30. Disputed. The United States provides national security assurances to Israel. Israel does not provide national security assurances to the United States. The U.S. "special relationship" with Israel was a major cause motivating the 9/11 terrorist attacks on America.[4] Threats to U.S. national security, therefore, are only heightened by secret, unlawful support advancing that relationship. Americans therefore have a right to know how many of their tax dollars are being put into a relationship that in fact threatens their national security.

31. Disputed. Overruled by Presidential declassification.

32. Disputed. Overruled by Presidential declassification.

33. Disputed. Overruled by Presidential declassification.

34. Disputed. As a relatively low level CIA functionary, Antoinette B. Shiner lacks the authority to overrule a de facto presidential declassification of the existence of the subject matter ought by the Plaintiff.

---

[4] What motivated the 9/11 hijackers? Congressional Testimony, 9/11 Commission Hearing. https://www.youtube.com/watch?v=J1bm2GPoFfg

Dated March 4, 2016                     Respectfully submitted,

                                        Grant F. Smith, Pro Se
                                        4101 Davis PL NW #2
                                        Washington, DC 20007
                                        (202) 640-3709