UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GRANT F. SMITH, <br><br> Plaintiff, <br><br> v. <br><br> CENTRAL INTELLIGENCE AGENCY, <br><br> Defendant. | Civil Action No. 1:15-cv-01431 (TSC) |

**MEMORANDUM OPINION**

Plaintiff Grant F. Smith, proceeding *pro se*, challenged the Central Intelligence Agency's (the "CIA") refusal to confirm or deny records responsive to his request under the Freedom of Information Act ("FOIA"). By Order dated March 30, 2017, the court denied the CIA's motion for summary judgment and ordered the CIA to process the FOIA request. (ECF No. 17.) The CIA subsequently moved for reconsideration, and by Order dated August 23, 2017, the court denied the motion, denied the motion for summary judgment on modified grounds, and granted the CIA leave to supplement the record and again move for summary judgment. (ECF No. 24.)

The CIA has again moved, pursuant to Federal Rule of Civil Procedure 56, for summary judgment. For the reasons set forth below, the CIA's motion will be GRANTED.

**I.    BACKGROUND**

Smith is a public interest researcher and founder of the Institute for Research: Middle Eastern Policy, Inc. (ECF No. 1 ("Compl.") at ¶ 4.) On March 19, 2015, he filed a FOIA request with the CIA for a copy of its intelligence budget, specifically, line items supporting Israel from 1990 through 2015. (*Id.*, Ex. 1.) Smith sought the information "for use in vital

1

public interest research into how nuclear weapons related know-how, material and technology have been unlawfully diverted into Israeli entities conducting clandestine nuclear weapons-related research and development." (Compl. ¶ 4.) On April 15, 2015, the CIA issued a *Glomar* response[1] that it could neither confirm nor deny the existence (or nonexistence) of any responsive documents, pursuant to FOIA Exemptions 1 and 3. (*Id.* ¶ 24.) On May 5, 2015, Smith filed an administrative appeal of the denial. (*Id.*, Ex. 3.) The CIA received the appeal on May 12, 2015 and sent a letter dated May 15, 2015 stating that due to the large number of requests, it was "unlikely" that the CIA would be able to respond within 20 working days, but that it would make "every reasonable effort" to respond as soon as possible. (*Id.*, Ex. 4.) The CIA eventually failed to respond within 20 working days. (*Id.* ¶¶ 27–32.) Then, on September 2, 2015, before the administrative appeal process was complete, Smith filed suit in this court.

As set forth in the court's March 30, 2017 Memorandum Opinion (ECF No. 16 ("Mem. Op.")), the court initially denied the CIA's motion for summary judgment (ECF No. 12) because the court determined that President Obama's statement in an address at American University on August 15, 2015 was an official acknowledgment of the line item sought. (Mem. Op. at 5–8.) In his address, President Obama stated that, "partly due to American military and intelligence assistance, which my administration has provided at unprecedented levels, Israel can defend itself against any conventional danger." (Compl. ¶ 26.) Based on the information available to the court at the time, President Obama's statement implied that the United States provided aid to

---

[1] A *Glomar* response is "[a] response to a FOIA request, in which an agency states that it can 'neither confirm nor deny' the existence of responsive records, [named] after a case concerning a FOIA request for records relating to an underwater sea craft called the 'Glomar Explorer.'" *Nation Mag., Wash. Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 888 n.2 (D.C. Cir. 1995) (citing *Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976)).

Israel, which requires financial support and thus would be reflected in an intelligence budget. (Mem. Op. at 5–6.) The court inferred that the CIA retained this budgetary information because the court was not aware of, and the CIA had not identified, any other agencies which provide intelligence assistance to other countries. (*Id.* at 6.) The court also relied on the CIA's reference to "the intelligence budget" to mean that there is such a budget and that it is the CIA's. (*Id.*) Because the court determined that President Obama's statement was an official acknowledgment of the information sought, it could not accept the CIA's *Glomar* response, and thus did not assess the CIA's invocation of Exemptions 1 and 3 in support of its *Glomar* response. (*Id.* at 8.) Instead, the court ordered the CIA to process the FOIA request, inform Smith of the number of records responsive to the request, and either release the records or identify exemptions that form the basis of withholding. (ECF No. 17 ("March 30, 2017 Order").)

On April 21, 2017, the CIA moved for reconsideration of the March 30, 2017 ruling because of "several factual misimpressions" that resulted in the court relying on the wrong precedent. (ECF No. 18-1 ("Def.'s Mot. Recons.") at 1–2.) The CIA refuted two inferences the court drew from President Obama's statement: (1) that the CIA provides intelligence support to Israel, and (2) that it therefore must have some means of appropriating funds to do so, meaning that the budget line items must exist. (*Id.*) The CIA corrected these "factual misimpressions" by pointing out that there are seventeen intelligence agencies able to provide intelligence assistance, and therefore it does not necessarily follow from President Obama's statement that the CIA provides intelligence assistance to Israel (*id.* at 4–6); and that because the intelligence community does not have a single intelligence budget, the CIA cannot be assumed to have budget line items pertaining to support for Israel, (*id.* at 6–7). In response, the court found that while President Obama's statement is not an official acknowledgment that the CIA is the actual

3

intelligence agency that provides support to Israel, it is an acknowledgment that some intelligence agency does provide support, and therefore would have budget line items. (ECF No. 24 ("August 23, 2017 Order") at 7–8.) Thus, the court declined to grant summary judgment to the CIA because it was unclear whether the CIA either creates or obtains and retains under its control other intelligence agencies' budget line items. (*Id.*) The court invited the CIA to supplement the record with additional information addressing the court's concerns and move again for summary judgment. (*Id.* at 8.) In its latest filings, the CIA has attempted to do so.

## II. LEGAL STANDARD

Summary judgment is proper where the record shows there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Waterhouse v. District of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002). Courts must view "the evidence in the light most favorable to the non-movant[] and draw[] all reasonable inferences accordingly," and determine whether a "reasonable jury could reach a verdict" in the non-movant's favor. *Lopez v. Council on Am.– Islamic Relations Action Network, Inc.*, 826 F.3d 492, 496 (D.C. Cir. 2016). "Where the nonmoving party is proceeding *pro se*, courts in this jurisdiction will construe the non-moving party's filings liberally." *Cunningham v. U.S. Dep't of Justice*, 40 F. Supp. 3d 71, 82 (D.D.C. 2014), *aff'd*, No. 14-5112, 2014 WL 5838164 (D.C. Cir. Oct. 21, 2014). "However, a *pro se* litigant still has the burden of establishing more than '[t]he mere existence of a scintilla of evidence' in support of his position." *Id.* (alteration in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "FOIA cases typically and appropriately are decided on

4

motions for summary judgment." *Georgacarakos v. FBI*, 908 F. Supp. 2d 176, 180 (D.D.C. 2012).

"FOIA provides a 'statutory right of public access to documents and records' held by federal government agencies." *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Justice*, 602 F. Supp. 2d 121, 123 (D.D.C. 2009) (quoting *Pratt v. Webster*, 673 F.2d 408, 413 (D.C. Cir. 1982)). FOIA requires that federal agencies comply with requests to make their records available to the public, unless such "information is exempted under [one of nine] clearly delineated statutory [exemptions]." *Citizens for Resp.*, 602 F. Supp. 2d at 123 (internal quotation marks omitted); *see also* 5 U.S.C. §§ 552(a)–(b).

The district court conducts a *de novo* review of the government's decision to withhold requested documents under any of FOIA's specific statutory exemptions. *See* 5 U.S.C. § 552(a)(4)(B). The burden is on the government agency to show that nondisclosed, requested material falls within a stated exemption. *See Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1433 (D.C. Cir. 1992) (citing 5 U.S.C. § 552(a)(4)(B)).

In FOIA cases, including those where a *Glomar* response is issued, summary judgment may be based solely on information provided in the agency's supporting declarations. *See Wolf v. CIA*, 473 F.3d 370, 375 (D.C. Cir. 2007) ("Proper invocation of, and affidavit support for, either Exemption, standing alone, may justify the CIA's *Glomar* response."); *Am. Civ. Liberties Union (ACLU) v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011) ("An agency withholding responsive documents from a FOIA release bears the burden of proving the applicability of claimed exemptions. Typically it does so by affidavit."). "If an agency's affidavit describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is

not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit alone." *Id.* "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Id.* (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (internal quotation marks omitted). "To successfully challenge an agency's showing that it complied with the FOIA, the plaintiff must come forward with 'specific facts' demonstrating that there is a genuine issue with respect to whether the agency has improperly withheld extant agency records." *Span v. U.S. Dep't of Justice*, 696 F. Supp. 2d 113, 119 (D.D.C. 2010) (citing *Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 (1989)).

## III. ANALYSIS

### A. The CIA's Response to Smith's FOIA Request

The CIA issued a *Glomar* response to Smith's FOIA request for a copy of intelligence line-item budget information reflecting U.S. aid to Israel. (Compl., Ex 2.) In the CIA's most recent motion for summary judgment, it contends that it is entitled to judgment as a matter of law because: (1) it has adduced facts demonstrating that the CIA is not the only intelligence agency to provide intelligence support abroad and does not control or maintain a single intelligence budget, thereby refuting this court's earlier finding that President Obama's statement constitutes an official acknowledgment; and (2) the information Smith seeks falls under Exemptions 1 and 3. (ECF No. 26 ("Def.'s Second Mot. Summ. J.") at 5, 12.) In light of the representations made in the supplemental declaration, the court agrees.

1. The CIA's *Glomar* response was proper.

An agency's *Glomar* response is proper if either confirming or denying the existence of responsive records "would itself 'cause harm cognizable under a[] FOIA exception.'" *ACLU v.*

*CIA*, 710 F.3d 422, 426 (D.C. Cir. 2013) (quoting *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1178 (D.C. Cir. 2011)).  A plaintiff may overcome an otherwise valid *Glomar* response, however, by showing that the sought-after records have been officially acknowledged in the public domain.  *See ACLU,* 710 F.3d at 426–27.

As detailed in the court's earlier opinion, an official acknowledgment inquiry in the *Glomar* context is not identical to a situation where an agency *does* acknowledge the existence of a record and invokes a FOIA exemption.  (Mem. Op. at 4–5.)  In those situations, the information requested must: (1) "be as specific as the information previously released," (2) "match the information previously disclosed," and (3) "already have been made public through an official and documented disclosure."  *Wolf*, 473 F.3d at 378 (quoting *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990)).  However, in the *Glomar* context, where the official acknowledgment demonstrates the existence of the records the requester seeks, "the prior disclosure necessarily matches both the information at issue—the existence of records—and the specific request for that information." *Wolf*, 473 F.3d at 379.  Accordingly, the court must analyze only whether the prior disclosure acknowledges the existence of the records sought, not whether the content of the records has been disclosed.  *See Marino v. Drug Enf't Admin.*, 685 F.3d 1076, 1081 (D.C. Cir. 2012) ("[T]he public domain exception is triggered when 'the prior disclosure establishes the *existence* (or not) of records responsive to the FOIA request,' regardless whether the contents of the records have been disclosed.") (quoting *Wolf*, 473 F.3d at 379) (emphasis in original).

Here, having received additional information, the court must re-examine its determination that President Obama's statement is an official acknowledgment that the CIA possesses the line-item budgetary information of United States aid to Israel.  As the court elaborated on in its August 23, 2017 Order, because the National Intelligence Program (NIP) develops the budget for

7

all intelligence agencies, if the CIA were to retain a copy of the NIP budget, then it would also have access to the line item that supports the "intelligence assistance" referenced by President Obama. (August 23, 2017 Order at 7.) Thus, the key issue is whether the CIA either creates, obtains, or retains under its control other intelligence agencies' budget line items.

In support of its contention that the CIA does not possess the budget line items of other intelligence agencies, the CIA submitted the supplemental declaration of Antoinette B. Shiner, the Information Review Officer ("IRO") for the Litigation Information Review Office of the CIA. (ECF No. 26-2 ("Second Decl.").) Shiner states that she has "confirmed with the Agency's Office of the Chief Financial Officer [CFO] that the CIA does not create, obtain, access or retain under its control the budget line items of other intelligence agencies." (*Id.* ¶ 5.) Shiner further clarifies that once the NIP budget is completed, the CIA receives a broad overview from the Director of National Intelligence (DNI) with only the top-line budget numbers and the specific portion pertaining to the CIA budget. (*Id.*) The portions of the NIP budget that the CIA receives from the DNI do not include the line item budgets of other intelligence agencies. (*Id.*)

The Shiner supplemental declaration is sufficiently detailed, as it demonstrates that Shiner consulted with the CIA's CFO—the most logical person at the CIA to provide insight into the agency's finances—and confirmed that the CIA does not retain, obtain, or access the budgetary information of other intelligence agencies. The declaration thus answers the narrow question presented by the court in its August 23, 2017 Order. (*See* August 23, 2017 Order.)

Smith—appearing to understand the strength of the declaration and the deference this court must afford to it—asks this court to infer that the CIA has the budget line items because of information that is publicly known. (ECF No. 33-1 ("Pl.'s Opp'n") at 23–31.) Smith points to the following as examples of such publicly accessible information: (1) the size of the CIA's

budget; (2) the CIA's involvement in various covert operations; (3) an interview with Michael Hayden, the former CIA and National Security Agency director, in the film *Zero Days*, in which Hayden discussed the United States' coordination with Israel to sabotage Iran's nuclear facilities (such as the deployment of STUXNET to prevent an Israel-Iran war); (4) an article about STUXNET; and (5) interviews of others in *Zero Days*, wherein they too discussed United States-Israel coordination. (*Id.* at 21–27.) Smith also notes that President Obama made the remark regarding the "unprecedented levels" of aid to Israel "during a speech intended" to secure support for the Iran nuclear deal. (*Id.* at 24.)

Smith is correct that courts "should not be ignorant as judges of what [they] know as men and women," *ACLU*, 710 F.3d at 431 (internal quotation marks omitted), when making the official acknowledgement determination. However, here, the court cannot make the inference Smith seeks.

In *ACLU*, the plaintiff sought records held by the CIA regarding the use of drones to carry out targeted killings. *Id.* at 425. In defending its *Glomar* response, the CIA argued solely that confirming the existence of any documents at all in its possession would reveal that the CIA was either involved in, or interested in, drone strikes. *Id.* at 427–28. The D.C. Circuit then reviewed remarks made by President Obama, Assistant to the President for Homeland Security and Counterterrorism John Brennan, and CIA Director Leon Panetta, and determined that it was neither logical nor plausible for the CIA to claim that it had never disclosed its interest in drone strikes. *Id.* at 429–30. Not only did Obama and Brennan explicitly confirm that the United States used drones and drew "on the full range of [its] intelligence capabilities," but Panetta also noted that the drone operations had been "very effective because they have been very precise in terms of the targeting," and drone strikes were the only mechanism by which "to disrupt the al-

9

Qaeda leadership." *Id.* Although these officials never explicitly stated that the CIA possessed responsive documents, their remarks made it impossible for the CIA to convincingly maintain that it had no interest in the use of drones and no documents relating to drone strikes. *Id.* at 428–32. Thus, the CIA's *Glomar* response, based solely on its concern that the existence *vel non* of responsive documents would reveal its interest in drone strikes, was deemed improper. *Id.* at 430.

In this case, Smith asks the court to make an inference beyond that made by the Circuit in *ACLU*. President Obama's statement regarding aid to Israel, however, does not rise to the level of specificity necessary for the court to make such an inference. Smith argues that President Obama's statement about the intelligence community necessarily implies that the CIA retains a budget line item of United States aid to Israel. (Pl.'s Opp'n at 28.) However, because, as noted above, the CIA does not retain the intelligence budgets of other agencies, President Obama's statement is not specific enough to support such an inference. And President Obama's remark does not undermine or contradict the CIA's proffered reasons for issuing the *Glomar* response, such as a concern that confirmation would reveal not only that the CIA is the specific agency administering aid to Israel, but also the specific type of aid being given and intelligence source information. This case is therefore inapposite to *ACLU*.

Accordingly, in light of the additional information submitted by the CIA in the supplemental declaration and the findings set forth above, the court hereby vacates its March 30, 2017 Order requiring the CIA to process the records in the usual manner required by FOIA, inform Smith of the number of records, and either release the records or justify its withholding pursuant to FOIA's exemptions. (March 30, 2017 Order.) The court also finds that President Obama did not officially acknowledge that the CIA possessed a budget line item for intelligence

assistance to Israel because the CIA does not possess the intelligence budget line items of other agencies. Thus, the CIA's *Glomar* response was proper.[2]

    2. <u>The CIA properly invoked Exemptions 1 and 3.</u>

FOIA contains nine exemptions on which agencies may rely to withhold documents. The *Glomar* response must show that confirming the existence of the requested records "would cause harm cognizable under a[] FOIA exemption." *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982). An affidavit claiming that the requested records fall within a FOIA exemption is sufficient if the application of the exemption is "logical" or "plausible." *See ACLU*, 628 F.3d at 619 (explaining that an agency's reasoning to support a FOIA exemption is sufficient if it is logical or plausible) (internal quotation marks omitted) (quoting *Larson*, 565 F.3d at 862).

    i. *Exemption 1*

FOIA Exemption 1 applies where the requested information is "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy" and is "properly classified" under the Executive order. 5 U.S.C. § 552(b)(1)(A). Executive Order 13,526 governs proper classification under § 552(b)(1) and requires that "the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security . . . and the original classification authority is able to identify or describe the damage." Exec. Order No. 13,526 § 1.1(a)(4); 75 Fed. Reg. 707 (2007). Executive Order 13,526 also requires that the

---

[2] In his opposition to the CIA's second motion for summary judgment, Smith again asks the court to consider President Obama's reference to "my administration" to include a timespan (1994–2007) before President Obama's inauguration (January 2009). (Pl.'s Opp'n at 28–29.) President Obama's statement explicitly references the support administered by his administration, and thus the court reiterates that the CIA's *Glomar* response was appropriate concerning the CIA's possession of any records pertaining to intelligence assistance for Israel before January 2009 or after January 2017.

11

information sought be "owned by, produced by or for, or is under the control of the United States Government." *Id.* § 1.1(a)(2).

Shiner is an original classification authority because she is the current IRO in the Litigation Information Review Office at the CIA. (ECF No. 12-2 ("Shiner Decl.") ¶¶ 3, 22.) This court has relied on affidavits by IROs of sub-groups within the CIA to classify information in support of *Glomar* response exemptions. *See Int'l Counsel Bureau v. CIA*, 774 F. Supp. 2d 262, 276–77 (D.D.C. 2011) (agreeing with CIA that IRO of the National Clandestine Service of the CIA is proper classification authority to invoke exemptions supporting *Glomar* response). The information sought is also "owned by and under the control" of the United States government because it is the budgetary information of the United States intelligence community. (Shiner Decl. ¶ 23.); Exec. Order No. 13,526 § 1.1(a)(4).

While Executive order 13,526 demands that affidavits "identify or describe" the reasonably expected "damage to the national security," *id.* § 1.1(a)(4), the court is mindful that "any affidavit or other agency statement of threatened harm to national security will always be speculative to some extent," *Wolf*, 473 F.3d at 374 (quoting *Halperin v. CIA*, 629 F.2d 144, 149 (D.C. Cir. 1980). And in analyzing government affidavits in the FOIA context, courts in this Circuit approach affidavits with the awareness that the Executive has a fuller knowledge of what information ought to be classified. *Ray v. Turner*, 587 F.2d 1187, 1194 (D.C. Cir. 1978) (explaining that legislative history indicates that government affidavits should be given substantial deference due to the expertise of the Executive in matters of national security). Moreover, in regard to foreign affairs, "courts have little expertise in either international diplomacy or counterintelligence operations" and thus "are in no position to dismiss [an agency's] facially reasonable concerns." *Frugone v. CIA*, 169 F.3d 772, 775 (D.C. Cir. 1999).

For example, in *Baez v. U.S. Dep't of Justice*, the D.C. Circuit determined that an affidavit of an FBI official stating that "the acknowledgment of the details or specific targets and methods described in [the requested] documents could lead to the disruption of foreign relations by precipitating possible diplomatic confrontations which could damage national security," in conjunction with other reasoning at the same level of specificity, was sufficient to affirm summary judgment for the FBI. 647 F.2d 1328, 1336–37 (D.C. Cir. 1980) (internal quotation marks omitted). Similarly, in *Frugone v. CIA*, the Circuit found that an affidavit the CIA produced in response to the plaintiff's FOIA request for the records of projects worked on by the plaintiff while at the CIA persuasively described the consequences of either confirming or denying the existence of such records, because such information "could cause greater diplomatic tension between Chile and the United States." 169 F.3d at 775.

However, courts in this Circuit do not rubber stamp any affidavit put forth by government agencies. Indeed, the D.C. Circuit found an affidavit claiming that disclosure would "jeopardize [the agency's] national security functions" to be too conclusory because it did not adequately describe the damage to national security. *See Founding Church of Scientology, Inc. v. Nat'l Sec. Agency*, 610 F.2d 824, 831 (D.C. Cir. 1979). Furthermore, the Court found that the affiant failed to elaborate on how compliance with the plaintiff's request could negatively affect the agency's "functions or faculty for intelligence operations." *See id.*

In this case, the detail of the supplemental declaration and the accompanying justifications provided are within the ambit of what the D.C. Circuit considers sufficient to support the claimed exemption in the *Glomar* context. The supplemental declaration offers similar detail to that offered in the affidavits deemed sufficient in *Baez* and *Frugone,* and far surpasses the detail deemed inadequate in *Founding Church*, as it identifies four ways in which

13

acknowledging the existence or nonexistence of line-item budget information would damage national security. First, line-item budget information reveals an agency's priorities and its ability to address those priorities. (*See* Shiner Decl. ¶ 27.) Revealing this information could reveal the agency's vulnerabilities and strengths to those who seek to exploit either. (*See id.* ¶ 28.) Second, revealing whether the CIA has the line items at issue could reveal the nature of the intelligence support provided by the United States to Israel because the CIA specializes in human intelligence. (*See* Second Decl. ¶ 6.) Third, confirming the existence of such information could damage relationships between the United States and foreign governments, hindering the CIA's collaboration with those governments. These relationships constitute intelligence sources and methods, and depend on secrecy. (*See* Shiner Decl. ¶ 29.) Fourth, revealing budget line items piece-by-piece could eventually create an entire United States aid to foreign powers blueprint that is valuable to adversaries. (*See id.* ¶ 28.)

Accordingly, the court finds that the CIA declarations are sufficiently detailed as to make it logical or plausible that acknowledging the existence (or non-existence) of line-item budget information could result in damage to national security.

### ii. Exemption 3

FOIA Exemption 3 applies where the information is specifically exempted from disclosure by statute. 5 U.S.C. § 552 (b)(3). The statute must "require[] that the matters be withheld from the public in such a manner as to leave no discretion on the issue" or "establish[] particular criteria for withholding or refer[] to particular types of matters to be withheld." *See id.* § 552(b)(3)(A)–(B). To prevail on summary judgment, the agency need only show that the statute claimed is an exemption statute under Exemption 3 and that the withheld material falls within the statute. *See CIA v. Sims*, 471 U.S. 159, 167 (1985) (explaining the first question is

whether the statute at issue is an exemption statute and the second is whether the materials sought are intelligence sources).

The National Security Act of 1947 ("Act"), as the CIA notes, is an exemption statute under Exemption 3. *See id.* ("Section 102(d)(3) of the National Security Act of 1947, which calls for the Director of Central Intelligence to protect 'intelligence sources and methods,' clearly 'refers to particular types of matters,' 5 U.S.C. § 552(b)(3)(B), and thus qualifies as a withholding statute under Exemption 3.") The CIA argues that under § 102(A)(i)(1) of the Act it can properly withhold a budget line item because doing so protects "intelligence sources and methods from unauthorized disclosure." (Def.'s Second Mot. Summ. J. at 24); 50 U.S.C. § 3024 (i)(1). The court agrees.

Material is properly withheld under § 102(A)(i)(1) of the Act if it "can reasonably be expected to lead to unauthorized disclosure of intelligence sources and methods." *Halperin*, 629 F.2d at 147 (internal quotation marks omitted). Thus, only a showing that the requested information could lead to revealing sources and methods is required, not a showing that the information itself is a source or method. Furthermore, the Supreme Court has advised that "it is the responsibility of the [intelligence community], not that of the judiciary, to weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk of compromising the . . . intelligence-gathering process." *Sims*, 471 U.S. at 180.

In *Leopold v. CIA*, the plaintiff sought budgetary information on the CIA's former detention and interrogation program, and the CIA claimed that Exemption 3 applied to its

redactions.³ 106 F. Supp. 3d 51, 53, 56 (D.D.C. 2015). In her affidavit, the Chief of the CIA's Litigation Support Unit explained that disclosing such budgetary information risked revealing intelligence sources and methods because "[d]isclosing intelligence expenditures would show the level of funding devoted to certain activities, which in turn would reveal the resources available to the Intelligence Community and the intelligence priorities of the U.S. Government." *Id.* at 58 (internal quotation marks omitted). The district court found that the CIA's argument that revealing funding for a particular program "could shed light on the funds that were available for particular activities, which could, in turn, divulge the agency's capabilities and priorities" was sufficient support for invoking Exemption 3. *Id.* Furthermore, the court in *Leopold* rejected the plaintiff's argument that disclosing an isolated sum of money could not reveal sources and methods of intelligence. *Id.* at 59. The court explained that giving small pieces of data could, over time, reveal a broader of picture of intelligence spending. *Id.*

Smith's request in this case raises an analogous issue. As in *Leopold*, where disclosing the amount used for the detention and interrogation programming could reveal agency capabilities and priorities, acknowledging the existence (or nonexistence) of a line item for aid to Israel could reveal the priorities of the CIA and intelligence community. The CIA is one of seventeen intelligence agencies, each of which has a particular specialty; the CIA specializes in human intelligence. (ECF No. 18-2 ("Ewing Decl.") ¶¶ 6, 8.) Thus, acknowledging that the CIA has access to the line item sought could reveal the type of aid given to Israel and programmatic priorities. (*See* Second Decl. ¶ 6); *Larson*, 565 F.3d at 864 ("Minor details of intelligence information may reveal more information than their apparent insignificance suggests because,

---

³ The CIA also successfully argued that Exemption 1 applied. *See Leopold*, 106 F. Supp. 3d at 61–64.

16

much like a piece of jigsaw puzzle, [each detail] may aid in piecing together other bits of information.") (internal quotation marks omitted).

Accordingly, because the Act is a proper exemption statute under Exemption 3, and the line item for United States aid to Israel is included in the expansive ambit of information that can reasonably lead to an unauthorized disclosure of sources and methods, the CIA properly invoked Exemption 3.

B. **Smith's Allegations of Bad Faith and Illegality**

Smith claims that the CIA's declaration is corrupt and that it seeks to conceal information of illegal activity. (Pl.'s Opp'n at 15–21, 31–33.) Neither argument is availing.

1. Smith has not met his burden of showing bad faith.

Government affidavits are afforded a presumption of good faith and cannot be rebutted "by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981)). However, the affidavits can be challenged on the basis that they were prepared in bad faith. *See ACLU*, 628 F.3d at 619.

Smith contends that the court should not accept the CIA declarations at face value because the CIA acted in bad faith in the past and therefore its declarations are tainted with untrustworthiness. (*See* Pl.'s Opp'n at 15–21.) As examples of past misconduct, Smith references the CIA's alleged illegal destruction of videotapes depicting CIA detainee torture, lying to the Senate committee about the effectiveness of torture methods, and withholding of information regarding the JFK assassination. (*See id.* at 15–19.)

In pressing this argument, Smith seeks to use past CIA actions, as well as unconfirmed reports and theories about CIA activities—none of which are connected to aid given to Israel—to

17

taint the declarations submitted in this case. But the fact that the CIA may have engaged in misconduct in the past does not, without more, show that it acted in bad faith in preparing these declarations. *See Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 608 F.2d 1381, 1387 (D.C. Cir. 1979) ("The sufficiency of the affidavits is not undermined by a mere allegation of agency misrepresentation or bad faith, nor by past agency misconduct in other unrelated cases."); *see also Ryan v. FBI*, No. 16-5108, 2016 WL 6237841, at *1 (D.C. Cir. Sept 16, 2016) (holding that plaintiff did not overcome presumption of good faith where FBI's conduct did not support inference of bad faith); *Assassination Archives & Research Ctr. v. CIA*, 177 F. Supp. 2d 1, 8 (D.D.C. 2001) ("[A] mere assertion of bad faith is not sufficient to overcome a motion for summary judgment.") Under Smith's reasoning, the CIA would *never* be able to provide affidavits untainted by past misconduct. That position cannot co-exist with the well-established doctrine that government affidavits are given the presumption of good faith.

Put simply, Smith has not met his burden of overcoming the presumption of good faith afforded to affidavits because the alleged misconduct he relies on is unrelated to this case.

2. Smith has not met his burden of showing illegality.

Section 1.7(1) of Executive Order 13,526 bars classifying information in order to conceal violations of the law. *See* Exec. Order 13,526 § 1.7(1). A plaintiff alleging that an agency has classified information to conceal a violation "must provide something more than conjecture to show that the agency's withholding decision violates Executive Order 13,526." *Associated Press v. FBI*, 265 F. Supp. 3d 82, 96–97 (D.D.C. 2017). Credible evidence is required. *See Canning v. U.S. Dep't of Justice*, 848 F. Supp. 1037, 1047–48 (D.D.C. 1994) (rejecting plaintiff's challenge where plaintiff presented claims "based primarily on speculation" and failed to present "credible

evidence that the agency's motives for its withholding decisions were improper or otherwise in violation of E.O. 12356").[4]

Smith relies heavily upon the Arms Export Control Act ("AECA"), 22 U.S.C. § 2799aa-1, under which "no funds made available to carry out the Foreign Assistance Act of 1961" or other provisions of the AECA "may be used for the purpose of providing," economic or military assistance to "any country which the President determines" to be engaged in nuclear weaponry. 22 U.S.C. § 2799aa-1(a)(1) (2012). The President may, however, waive such a sanction if he or she decides that the sanction "would be seriously prejudicial to the achievement of United States nonproliferation objectives or otherwise jeopardize the common defense and security." *Id.* § 2799aa-1 (a)(2).

Smith's theory under the AECA is as follows: It is public knowledge that Israel has a nuclear weapons program. Therefore, any United States aid to Israel is either economic or military assistance and thus illegal under the AECA. (Pl.'s Opp'n at 31–33.)

Smith offers no support for his assertion that the aid offered by United States intelligence agencies is of the type considered by the AECA, let alone "all" of the aid offered to Israel by the CIA or other agencies. (*See id.* at 32.) Moreover, the AECA only bars foreign aid to countries that the President has determined to be delivering or amassing nuclear weapons. *See* 22 U.S.C. § 2799aa-1(a)(1) (2012). Smith has not shown that any United States President has found Israel to be engaging in such activity, and he also lacks standing to compel such a determination. *See Smith v. United States*, 715 F. App'x 10, 10 (D.C. Cir. 2018) ("The district court correctly concluded that appellant lacked standing to seek a writ of mandamus directing the President to

---

[4] Executive Order 13,526, signed by President Obama on December 29, 2009, was previously Executive Order 12,356, signed by President Reagan on April 2, 1982. Exec. Order No. 12,356, 47 Fed. Reg. 14,874 (1982).

determine, pursuant to the Arms Export Control Act of 1961, 22 U.S.C. § 2799aa-1, whether Israel has engaged in certain conduct related to the development of nuclear weapons."). It must necessarily follow that, because no United States President has made such a determination, no President has had occasion to enter the waiver, and therefore Smith's argument regarding the lack of a waiver is irrelevant.

Accordingly, Smith has not met his burden of showing that the declarations provided by the CIA were intended to conceal illegal information and the CIA's invocation of FOIA Exemptions 1 and 3 was proper.

## IV. CONCLUSION

For the foregoing reasons, the CIA's Motion for Summary Judgment will be GRANTED. The clerk of court is respectfully directed to close this case.

A corresponding order will issue separately.

Date: August 20, 2019

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge